**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 8 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GARY RUSSELL SMITH,

      Plaintiff-Appellant,

v.

JAMES SPAIN,

      Defendant-Appellee.

No. 96-2164
(D.C. No. CIV 95-634 BB)
(District of New Mexico)

**ORDER AND JUDGMENT**[*]

Before **Ebel**, Circuit Judge, **Henry**, Circuit Judge, and **McWilliams**, Senior Circuit Judge.

Pursuant to 42 U.S.C. § 1983, Gary Russell Smith filed an action in the United States District Court for the District of New Mexico against James Spain, a police officer for Albuquerque, New Mexico, alleging that Spain had deprived him of his Fourth Amendment rights. Specifically, Smith claimed that Spain unlawfully detained him, unlawfully searched a fannypack he was carrying around his waist, and then unlawfully arrested him when marijuana and drug paraphernalia were found in the fannypack. Smith

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

sought damages for the deprivation of his privacy, deprivation of his liberty in being placed in jail, criminal prosecution, and emotional distress and depression, in an unspecified amount, "to be determined by the fact finder."

By answer, Spain alleged, *inter alia,* that his "actions were lawful, in good faith, and in the exercise of governmental functions entitling Officer Spain to qualified immunity." This claim of qualified immunity was also set forth in both the Initial Pretrial Report and the ensuing Pretrial Order.

Both Smith and Spain withdrew their initial requests for a jury trial, and the case was heard by a judge, sitting without a jury. At the conclusion of Smith's case, Spain's counsel moved to dismiss under Fed. R. Civ. P. 41(b) and 50, arguing, *inter alia,* that Spain, a police officer, was entitled to qualified immunity. The district court, after argument, denied the motion. The trial then proceeded on to conclusion, when the district court took the case under advisement, and allowed counsel to file post trial briefs. In his brief, counsel again argued, *inter alia,* that Spain was entitled to qualified immunity.

The district court later made its findings and conclusions, which are in considerable detail, and held that Spain was entitled to qualified immunity and entered judgment in favor of Spain. Specifically, the district court concluded, *inter alia,* that "[a] reasonable officer in Defendant's position could thus have believed his conduct was lawful and Defendant is protected by the legal doctrine of qualified immunity." Smith appeals. We affirm.

Initially, Smith claims that Spain "waived his qualified immunity defense . . . ." However, it appears to us that Spain asserted a right to qualified immunity at about every opportunity. Qualified immunity is an affirmative defense and a defendant may raise it by a motion to dismiss, a motion for summary judgment or by answer. Further, a defendant who unsuccessfully raises the defense of qualified immunity before trial, may thereafter reassert such defense "at trail or after trial." *Quezada v. County of Bernalillo,* 944 F.2d 710, 718 (l0th Cir. 1991).

Certainly, the defense of qualified immunity, as such, was not waived. We are not here concerned with whether qualified immunity was couched in any particular language. And in any event, counsel for Smith concedes that even if it were waived, there remains the underlying question of whether the search of Smith by Spain, and the seizure from Smith of the marijuana and drug paraphernalia were reasonable, and therefore lawful. Obviously, the case turns on the facts and circumstances surrounding the detention of Smith, and the ensuing search and seizure. Basically those facts and circumstances are not in any great dispute. We shall attempt to summarize those facts and circumstances as briefly as possible.

On August 13, 1994, Spain, a Sergeant with the Albuquerque Police Department, and fellow officers Eloise Griego and Paul Montoya were engaged in an undercover operation to detect and arrest prostitutes and their patrons in the East Central area of Albuquerque, a so-called "high crime" area. At that time and place Spain and Griego

observed a woman approaching cars on East Central Avenue in what appeared to be an effort to solicit herself as a prostitute. The two officers detained the woman, later identified as Marcia Shyne, for questioning. It was determined that Shyne was, in fact, engaged in criminal solicitation and that she might have information which would lead to other arrests. Griego placed Shyne in an unmarked police vehicle parked in the parking lot of The Ranch, a bar located at 8900 Central Avenue, N.E. Spain thereafter arrived at the same parking lot and parked his unmarked vehicle along side of, and next to, Griego's vehicle. Spain was dressed in street clothes, not a police uniform, but wore his police badge as a neck medallion. In questioning Shyne, the two officers learned that Shyne was part of a prostitution ring operating throughout the United States. This all occurred at about 4:30 p.m. At about this moment, Smith approached the scene, at which time Griego and Shyne were seated in Griego's vehicle, and Spain was standing between the two vehicles, which were the only vehicles in the parking lot.

When Spain first saw Smith, the latter was walking through the parking lot in a direction which was generally away from the two parked unmarked police vehicles. However, when Smith saw Spain, he changed his direction and, with an angry expression on his face, began to walk directly towards the two vehicles.[1] As he neared the parked

---

[1]Smith was apparently a part-time security guard at The Ranch bar, although there is nothing to indicate that either Spain or Griego knew of this. Smith was not on duty at the time nor was he in uniform. Rather, he was going from another bar to The Ranch to "socialize."

vehicles, Spain, wearing his badge as a medallion around his neck, identified himself as a police officer and, in general terms, informed Smith that a police investigation was in progress and asked him to leave the area. Although told not to move any closer, Smith continued to draw nearer to the investigation site. Smith had a pack of cigarettes in his hand. Also, Smith had a fannypack around his waist, and while moving toward Spain, he started fumbling with his fannypack as if trying to remove something therefrom. Spain then drew his firearm and held it at a ready position at his side standing behind his police car so that Smith could not see his weapon.

At this point, the government concedes that Smith was not free to leave because Spain decided that it was advisable to search Smith's fannypack to find out whether he had a firearm therein. Accordingly, Spain grabbed Smith and walked him to a nearby wall. There was little resistance by Smith. After having placed Smith in a "spread eagle" position against the wall, Spain grabbed the fannnypack from Smith's waist, and in the process felt what he thought was a firearm in the fannypack. Without "patting down," as such, the fannypack, he unzipped the fannypack and found marijuana and a marijuana pipe therein, but no weapon. Spain then arrested Smith for possession of marijuana and drug paraphernalia.

At about this point, Officer Montoya arrived on the scene. He saw no cuts or abrasions on Smith's head or face. As the officers were still conducting their ongoing investigation of Shyne, other officers took Smith to the local detention center. The

officer who transported Smith to the center testified that he saw no cuts or abrasions on Smith's face. The medical technician who examined Smith at the detention center testified that Smith had no injuries of any kind to his face, but that Smith did have an abrasion on his elbow, and smelled of alcohol.

The foregoing summary is based, in the main, on the district court's findings of fact, to which Smith, on appeal, makes no particular challenge. In fact, in his brief, counsel for Smith stated that he "is not unhappy with the district court's factual findings in the trial," and that Smith's appeal relies, principally, on the factual findings made by the district court. However, at the same time, counsel also argues that certain of the district court's findings are unsupported by the evidence.

Government officials performing discretionary functions are given qualified immunity which shields them from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated," and further that such immunity "protects all but the plainly incompetent or those who knowingly violate the law . . .." *Anderson v. Creighton,* 483 U.S. 635, 638 (1986). In line with *Anderson, supra,* in *Dixon v. Richer,* 922 F.2d 1456 (10th Cir. 1991) we held that the doctrine of qualified immunity shields government officials from liability for civil damages if their conduct does not violate clearly established constitutional rights of which reasonable persons would have known. Our study of the record leads us to conclude that the facts and circumstances of the case support the district court's conclusion that Spain

was entitled to qualified immunity.

Spain, and his fellow officer, had arrested Shyne for solicitation for prostitution and were in the process of questioning her in a parking lot adjacent to The Ranch. Spain indicated that he was aware that prostitutes frequently have their pimp nearby monitoring their enterprise. Smith, when first observed by Spain, was walking through the parking lot away from the investigation site. However, when he saw Spain and the others, he abruptly changed direction and walked straight towards Spain, Griego and Shyne. Spain identified himself as a police officer, and wore his badge as a medallion around his neck. Smith had a fannypack around his waist, and Spain testified that he was aware that firearms were often carried in a fannypack, even by police officers. Spain told Smith to "stop" and indicated he should leave the area. Smith did not stop and continued to walk towards Spain. At that point Smith tried to unzip his fannypack and appeared to be trying to remove an object from the fannypack. Spain's reaction was that Smith might be going for a weapon. It was in this general setting that Spain removed the fannypack from around Smith's waist and Spain testified that, in so doing, he felt an object in the fannypack that felt like a firearm.[2] Spain then inspected the fannypack, finding no weapon therein, but finding marijuana and a marijuana pipe.

Like the district court, we conclude that Spain's conduct was, under the described

---

[2]N.M. Stat. Ann. § 30-7-2 (1978) (Repl. Pamp. 1994) provides that it shall be unlawful to carry a concealed loaded weapon, with certain exceptions thereto.

circumstances, reasonable.  The alternative for Spain was to do nothing and hope that Smith did not have a firearm in the fannypack.  The law does not require that a police officer take such a risk, and permits a limited stop, detention and seizure if there be "objective reasonableness."[3]  The present case in our view comes well within the ambit of *Terry v. Ohio,* 392 U.S. 1 (1968).  As was said in *Terry,* the reasonableness of any search and seizure must be assessed in light of the particular circumstances against the standard of whether a man of reasonable caution is warranted in believing that the action taken was appropriate.  *Terry*, 392 U.S. at 21-22.

We are not persuaded by *United States v. Davis,* 94 F.3d 1465 (10th Cir. 1996), relied on by Smith.  *Davis* is a criminal case in which we, on appeal, held that there was no reasonable suspicion to justify the investigative stop and that the district court therefore erred in denying the defendant's motion to suppress the use at trial of the firearm there in question.  However, the facts of the instant case are different than those in *Davis.*  For example, the defendant in *Davis* was apparently walking away from the police immediately prior to the "stop" and was posing no immediate threat, whereas Smith, in the instant case, was walking towards the police in an angry and threatening manner and was attempting to extract something from his fannypack.  There are other differences between the instant case and *Davis,* as well.

---

[3]A police officer is not required to use the "least intrusive means" in a stop or seizure case, only that he use "reasonable ones."  *United States v. Melendez-Garcia,* 28 F.3d 1046, 1052 (10th Cir. 1994).

In sum, in the words of *Anderson v. Creighton, supra,* Spain's conduct did not indicate that he was "plainly incompetent" nor did his actions indicate that he intended to "knowingly violate the law." Rather, his conduct was reasonable under the facts and circumstances confronting him, where, in the interest of self-preservation, he had to make split second decisions.

Judgment affirmed.

ENTERED FOR THE COURT

Robert H. McWilliams
Senior Circuit Judge